**LAW OFFICE OF BRIAN NOMI**
Brian H. Nomi, Esq. (CBN: 203059)
*Local Counsel*
215 E Daily Dr, Ste 28
Camarillo, CA 93010
P: (805) 444-5960
F: (805) 357-5333
briannomi@yahoo.com

**AYALA LAW, P.A.**
Eduardo A. Maura, Esq. (FBN: 91303)
*Pro Hac Vice Counsel* [pending]
2490 Coral Way, Ste 401
Miami, FL 33145
P: (305) 570-2208
F: (305) 503-7206
eduardo@ayalalawpa.com

Attorneys for Plaintiff
Dr. Raul M. Manzaneda

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DR. RAUL M. MANZANEDA,<br><br>    *Plaintiff,*<br><br>v.<br><br>DR. ALFREDO E. HOYOS, AMERICAN SOCIETY FOR AESTHETIC PLASTIC SURGERY, INC. d/b/a THE AESTHETIC SOCIETY, and OXFORD UNIVERSITY PRESS, INC.,<br><br>    *Defendants.* | Case No. 26-cv-<br><br>**COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Dr. Raul M. Manzaneda, through his undersigned attorneys, for his Complaint against Defendants Dr. Alfredo E. Hoyos, American Society for Aesthetic Plastic Surgery, Inc. d/b/a The Aesthetic Society, and Oxford University Press, Inc., alleges, on knowledge as to his actions, and otherwise upon information and belief, as follows:

1

## PARTIES

1.      Plaintiff Dr. Raul M. Manzaneda (Dr. Manzaneda) is an individual who is a citizen of Peru. Dr. Manzaneda is a plastic and reconstructive surgeon.

2.      On information and belief, Defendant Dr. Alfredo E. Hoyos (Dr. Hoyos) is an individual who is a citizen of Colombia. Dr. Hoyos is a plastic surgeon.

3.      Defendant American Society for Aesthetic Plastic Surgery, Inc. d/b/a The Aesthetic Society (ASAPS) is a corporation that is incorporated in Georgia, with its principal place of business in Garden Grove, California. ASAPS is the editor and publisher of *Aesthetic Surgery Journal*.

4.      Defendant Oxford University Press, Inc. (OUP) is a corporation that is incorporated in Delaware, with a principal place of business in New York, New York. OUP publishes *Aesthetic Surgery Journal* on behalf of ASAPS.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action between citizens of a State and citizens of a foreign state, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is proper in this district under 28 U.S.C. § 1391, because ASAPS is subject to personal jurisdiction in this district with respect to this action, and there is no other district in which the action may otherwise be brought.

///

## FACTS

**I.      Dr. Manzaneda's Development of RibXcar**

7.      Dr. Manzaneda's line of work focuses on the development of advanced body contouring techniques and surgical innovation.

8.      Since 2020, Dr. Manzaneda has contributed to the body contouring field by developing muscle volumization techniques like VDV-FAT, FAT-TRAP, XPINE-FAT, HV-FAT, and MASS-FAT.

9.      Dr. Manzaneda later focused on osteocartilaginous contouring, with the development of procedures like FrontXribs, Xonversion Ribs, XCrest, and RibXcar.

10.      Dr. Manzaneda's work has been published in scientific publications like *Plastic and Reconstructive Surgery–Global Open* (PRS Global Open) and *Aesthetic Surgery Journal* (ASJ).

11.      In 2023, RibXcar was introduced by Dr. Manzaneda as an incisionless, and ultrasound-guided rib remodeling technique, based on a controlled monocortical fracture, aimed at waist reduction without rib resection.

12.      Subsequently, Dr. Manzaneda's work gained greater academic visibility upon receiving the 2024 PRS Global Open Best Cosmetic Paper Award, a distinction that reinforced the initial impact of RibXcar within the field of aesthetic surgery and advanced body contouring.

13.    Later, Dr. Manzaneda further developed RibXcar by incorporating a tip specifically adapted for the piezotome, dubbed "Manzaneda's Tool," designed with the aim of optimizing the vertical approach, reducing thermal friction, and enhancing precision during controlled corticotomy.

14.    Furthermore, the systematic use of intraoperative ultrasound constitutes a fundamental safety element of RibXcar, as it enables real-time verification of the depth of the approach, the orientation of the instrument, and the correct execution of the monocortical osteoclasis.

15.    Therefore, the RibXcar technique is grounded not only in the principle of minimal invasiveness but also in a strategy of dynamic anatomical control aimed at reducing risks and enhancing the reproducibility of the procedure.

16.    In light of these scientific advancements in aesthetic rib remodeling, Dr. Hoyos proposed to Dr. Manzaneda to develop a collaborative academic work which would compile the most prominent and emerging techniques in rib surgery.

17.    From this initiative emerged the book *Rib Revolution: Rib Surgeries for Aesthetic Waistline Definition*, aimed at integrating anatomical, biomechanical, and surgical principles related to contemporary rib remodeling.

18.    In said book, Dr. Manzaneda is listed as the lead author, joined by Dr. Hoyos and Dr. Hugo Aguilar as co-authors—evidence of an initial stage of academic collaboration among the key figures involved in the development of the techniques.

4

## II.   Dr. Hoyos' Criticism of RibXcar

19.   Parallel to the development of RibXcar, other groups began presenting alternative rib remodeling techniques.

20.   In May 2025, Dr. Hoyos then published the article "Waistline Aesthetic Slimming by Puncture and Parallel Approach for Rib Remodeling Procedures"[1] in ASJ, in which Dr. Hoyos presented the WASP technique as a rib remodeling proposal based on a parallel puncture approach.

21.   In his article, Dr. Hoyos not only described WASP but also compared it conceptually with other techniques, including RibXcar.

22.   Dr. Hoyos drew a distinction between parallel approaches (WASP) and perpendicular approaches (RibXcar), attributing to the latter theoretical risks related to the trajectory toward the pleural plane, thermal control, and instrument safety.

23.   In September 2025, Dr. Manzaneda's article, "Safety Evaluation of the RibXcar Technique Using the Piezotome: An Analysis of Surgical Complications,"[2] was published in PRS Global Open.

24.   This study analyzed a survey of 113 plastic surgeons that performed rib remodeling via punctures, evaluating numerous variables like learning method, use of ultrasound, type of instrument, and major complications.

[1] https://academic.oup.com/asjopenforum/article/doi/10.1093/asjof/ojaf044/8151341.
[2] https://journals.lww.com/prsgo/fulltext/2025/09000/safety_evaluation_of_the_ribxcar_technique_using.53.aspx.

25.     The study found 2.65% of respondents reported serious complications, such as pneumothorax or hemothorax, and concluded that the technique appeared to be well adopted and safe, according to the surgeons who practiced it.

26.     Subsequently, in November 2025, Dr. Manzaneda published a response titled "Response by Manzaneda to 'Waistline Aesthetic Slimming by Puncture and Parallel Approach for Rib Remodeling Procedures' by Hoyos et al"[3] in ASJ.

27.     In said response, Dr. Manzaneda defended the safety profile of RibXcar, noting that the initial series of 30 patients published in 2023 and a subsequent cohort of over 200 cases published in 2025 reported neither visceral injuries nor deep burns.

28.     Dr. Manzaneda also highlighted the technical progress of the procedure using Manzaneda's Tool, as well as the systematic use of intraoperative ultrasound to verify depth and monocortical osteoclasis in real time.

29.     In December 2025, Dr. Hoyos then published his "Reply to Response by Manzaneda to 'Waistline Aesthetic Slimming by Puncture and Parallel Approach for Rib Remodeling Procedures'"[4] in ASJ.

30.     In his reply, Dr. Hoyos divided rib remodeling in two technical families: parallel corticotomy techniques, which included WASP, and perpendicular puncture techniques, under which he classified RibXcar.

[3] https://academic.oup.com/asjopenforum/article/doi/10.1093/asjof/ojaf137/8314857.
[4] https://academic.oup.com/asjopenforum/article/doi/10.1093/asjof/ojaf171/8384001.

31.    In said reply, Dr. Hoyos maintained that the perpendicular approach of RibXcar had a shorter trajectory toward the pleural plane and would also rely more heavily on energy control and tip behavior.

32.    In February 2026, ASAPS then presented Dr. Hoyos with the award for "Best International Article of 2025" for his article on WASP. *See* Announcement, at **Exhibit 1**.

33.    In April 2026, Dr. Hoyos published "Global Survey on Rib Remodeling Techniques: Assessing Complications and Safety in Waistline Contouring".[5]

34.    This study reported data from 2,351 patient records between 2018 and 2024, with an overall complication rate of 3.7%, and noted that major complications, such as pneumothorax, were rare (0.17%) and allegedly only occurred in cases where RibXcar was used.

35.    However, this study included no analysis by operator or institution, nor any data traceability or provenance.

### III.    Publication of Mortality Article in ASJ

36.    On May 6, 2026, the article "Fatal Complications Associated with Rib Remodeling: A Multinational Patient-Safety Case Series"[6] (the "Mortality Article") was published in ASJ by Dr. Hoyos et al.

---

[5] https://journals.lww.com/prsgo/fulltext/2026/04000/global_survey_on_rib_remodeling_techniques_.25.aspx.
[6] https://doi.org/10.1093/asj/sjag089.

7

37. The Mortality Article reports six deaths associated with rib remodeling using a puncture technique in Peru, Ecuador, and Mexico, and mentions documented causes like pulmonary thromboembolism, visceral injury with peritonitis, and acute respiratory failure.

38. The Mortality Article raises concerns regarding biomechanical safety of the RibXcar perpendicular approach via costal puncture and recommends increased scrutiny, standardized training, and anatomical risk assessment.

39. The Mortality Article claims that percutaneous puncture techniques like RibXcar rely on tactile feedback rather than direct visualization, which may increase the risk of unintended injury to intrathoracic or intra-abdominal structures.

40. The Mortality Article contends that parallel corticotomy techniques like WASP use a blunt tip and parallel force vector, which may reduce the likelihood of deep penetration beyond the bone, in contrast to RibXcar's perpendicular approach.

41. The Mortality Article argues that the identification of multiple fatalities suggests that the risks of RibXcar may be greater than previously reported.

42. The Mortality Article attributes the six deaths to the RibXcar technique; however, in all these cases, the patients simultaneously underwent multiple surgical procedures, such as abdominoplasty, liposuction, fat grafting, or brachioplasty, with surgical times ranging from 4 to 8 hours.

43. The Mortality Article does not present a multivariable analysis, does not include an anatomopathological determination establishing which specific procedure caused which specific harm, and there is no direct evidence that RibXcar technique was the determining cause of the deaths.

44. Hence, the Mortality Article fails to establish a real causal link between RibXcar and the reported deaths, given that it attempts to discredit RibXcar without isolating or eliminating the effects of other procedures involved in these fatal cases.

45. The Mortality Article is also deficient in many other aspects, including absence of adequate peer review; absence of complete autopsies in most cases; lack of independent forensic analysis; absence of Institutional Review Board and ethical approval; lack of verified institutional consent; and untraceable data.

46. The Mortality Article clearly has grave scientific, ethical, medico-legal, reputational, and institutional implications for Dr. Manzaneda, given that it links six deaths to his RibXcar technique.

47. The Mortality Article claims the authors have "no potential conflicts of interest with respect to the research, authorship, and publication of this article."

48. However, Dr. Hoyos has an evident conflict of interest, given that he is in direct competition with Dr. Manzaneda, and benefits from disparaging the latter's RibXcar technique, while presenting his own WASP technique as superior.

9

49.    Besides, Dr. Mauricio E. Perez Pachon, who is listed as the lead author of the Mortality Article, currently serves as the Scientific Director of Total Definer, a company owned by Dr. Hoyos, under whose direction all scientific activities of his medical group are coordinated.

50.    Consequently, the undeclared conflict of interest is not limited solely to Dr. Hoyos as the creator of WASP but also extends to Dr. Perez, an employee of Dr. Hoyos, whose scientific publications serve the commercial interests of his employer.

51.    ASAPS knew of Dr. Hoyos' conflict of interest, given its publication of articles on the competing techniques and its award of "Best International Article of 2025" to Dr. Hoyos for his article on WASP only three months before publishing the Mortality Article.

52.    Despite being aware of this clear conflict of interest, ASAPS published the Mortality Article without requiring a proper disclosure of such conflict.

IV.    **Response to Mortality Article**

53.    The Peruvian Society of Plastic Surgery (the Society) is recognized by the Medical College of Peru as the official regulatory body for the proper practice of plastic surgery in Peru.

54.    On May 8, 2026, the Society sent a letter to the Editor-in-Chief and the Editorial Board of ASJ to express its concern about the Mortality Article. *See* Letter, at **Exhibit 2**.

55.     As stated in its letter, the Society is "unaware of the origin, traceability, reporting mechanism, and institutional validation of these alleged mortality cases," and likewise has "no knowledge that such reports were communicated to, reviewed by, or corroborated through official channels." *Id.*, p.1.

56.     As noted in this letter, "[t]he mere existence of a temporal association between a surgical procedure and a fatal outcome does not, in itself, establish a direct causal relationship." *Id.*

57.     The Society expressed its concern that the Mortality Article "may lead to categorical or technically biased conclusions regarding the causality of the events described," without the "expert, forensic, and institutional documentation necessary to substantiate such assertions." *Id.*

58.     The Society also rejected the "use of information that is uncorroborated, incomplete, or presented out of context," especially when it may "favor commercial comparisons." *Id.*, p.2.

59.     On this last point, the Society affirmed that "[a]ny misrepresentation of the truth, omission of relevant variables, or use of sensitive data for promotional or competitive purposes is contrary to medical ethics, good scientific practice, and the principles of transparency that must govern all biomedical publications." *Id.*

60.     Based on the foregoing, the Society asked the Editorial Board of ASJ to start "an editorial investigation into the ethical, methodological, and documentary validity" of the Mortality Article. *Id.*

61.     The Society requested the Editorial Board to review the "traceability of the reported cases, particularly those attributed to Peru," and to verify the "ethical, institutional, and medico-legal authorizations used for the analysis and publication of said cases." *Id.*

62.     The Society asked the Editorial Board to formally retract the Mortality Article "should the absence of sufficient documentary support, lack of institutional validation, relevant ethical deficiencies, or conclusions unsupported by verifiable evidence be confirmed." *Id.*

63.     The Society requested that, while this investigation was underway, "the Journal consider issuing an Editorial Expression of Concern, in order to prevent the scientific community, patients, and the media from interpreting as conclusive facts any statements that . . . require further verification." *Id.*

64.     Dr. Minyor Avellaneda, one of the purported co-authors of the Mortality Article, also wrote to the Editorial Board of ASJ asking for the removal of his name from the article since neither he nor the Colombian Society of Plastic, Aesthetic and Reconstructive Surgery participated in the collection of clinical cases, data analysis, interpretation of results, manuscript development, or the conclusions presented.

65.    Dr. Avellaneda stated that neither he nor the Colombian Society were in a position to issue institutional judgments, scientific conclusions, or endorsements regarding specific surgical techniques and commercially named procedures in plastic surgery as presented in the Mortality Article.

66.    Despite being aware of these serious issues with the Mortality Article, and the reputational damage it could and has caused Dr. Manzaneda, Defendants did not retract the Mortality Article nor issue an Editorial Expression of Concern.

### COUNT I – Defamation (Libel)
*(Against all Defendants)*

67.    Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

68.    Defendants published statements concerning Dr. Manzaneda's RibXcar technique in ASJ, which were false and defamatory, including statements attributing fatal complications and deaths to Dr. Manzaneda's technique without the necessary evidentiary support or proper causal analysis.

69.    These statements were published to third parties, including the scientific and medical community, and were reasonably understood to be about Dr. Manzaneda and his RibXcar technique.

70.    The statements were made without privilege or authorization and were published with knowledge of their falsity or with reckless disregard for the truth, as evidenced by the lack of verifiable documentation, incomplete case traceability, and failure to exclude alternative causes.

13

71. As a direct and proximate result of Defendants' actions, Dr. Manzaneda has suffered and continues to suffer harm to his reputation, professional standing and economic interests, in an amount to be proven at trial.

## COUNT II – Defamation (Trade Libel)
### *(Against all Defendants)*

72. Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

73. Defendants published false and disparaging statements in ASJ about Dr. Manzaneda's RibXcar technique, including claims of fatal complications and lack of safety, with the intent to harm Dr. Manzaneda's economic interests and to promote competing techniques.

74. Defendants knew or should have known that the statements were false or made them with reckless disregard for their truth or falsity.

75. As a direct and proximate result of Defendants' actions, Dr. Manzaneda has suffered damages, including the loss of business and professional opportunities, in an amount to be proven at trial.

## COUNT III – Invasion of Privacy (False Light)
### *(Against all Defendants)*

76. Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

77. Defendants publicized statements that placed Dr. Manzaneda in a false light before the public by attributing patient deaths and serious complications to Dr. Manzaneda's RibXcar technique without adequate evidentiary support.

14

78.     This false light in which Dr. Manzaneda was placed is highly offensive to a reasonable person and was created with knowledge of or reckless disregard for the falsity of the statements.

79.     As a direct and proximate result of Defendants' actions, Dr. Manzaneda has suffered harm to his reputation, emotional distress, as well as other damages in an amount to be proven at trial.

### COUNT IV – Libel (Cal. Civ. Code § 45)
*(Against all Defendants)*

80.     Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

81.     Defendants published false and unprivileged statements that tended to injure Dr. Manzaneda in his profession or exposed him to hatred, contempt, ridicule, or obloquy, or caused him to be shunned or avoided, in violation of California Civil Code § 45.

82.     As a result of Defendants' actions, Dr. Manzaneda has suffered damages in an amount to be proven at trial.

### COUNT V – Unfair Competition (Cal. Bus. & Prof. Code § 17200)
*(Against all Defendants)*

83.     Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

84.     Defendant's acts constitute unlawful business acts under Section 17200 of the California Business and Professions Code.

85. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices by publishing false and misleading statements about Dr. Manzaneda's RibXcar technique, harming Dr. Manzaneda's business and professional interests, in violation of Cal. Bus. & Prof. Code § 17200.

86. Defendant's conduct is causing irreparable injury to Dr. Manzaneda and to his reputation and will continue to damage Dr. Manzaneda unless enjoined by this court. Dr. Manzaneda has no adequate remedy at law.

87. Dr. Manzaneda is entitled to, inter alia, injunctive relief and restitution, together with prejudgment and post-judgment interest.

## COUNT VI – False or Misleading Statements (Cal. Bus. & Prof. Code §17500)
*(Against all Defendants)*

88. Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

89. Defendants, in connection with marketing and promotion of competing rib remodeling techniques, made and disseminated untrue and misleading statements regarding the safety and efficacy of Dr. Manzaneda's RibXcar technique, in violation of Cal. Bus. & Prof. Code § 17500.

90. As a result of Defendants' actions, Dr. Manzaneda has suffered damages and seeks injunctive relief as permitted by law.

## COUNT VII – Injunctive Relief
*(Against all Defendants)*

91. Plaintiff repeats and realleges paragraphs 1 to 66, as if set forth herein.

16

92.    Before they published the Mortality Article, Defendants knew or should have known about Dr. Hoyos' conflict of interest.

93.    After they published the Mortality Article, Defendants were notified of several issues with the Mortality Article by the Peruvian Society of Plastic Surgery and Dr. Avellaneda.

94.    OUP has a policy to issue an "Expression of Concern" when a journal's editorial team "wishes to notify readers of a potential problem in a paper that requires further investigation."[7]

95.    Despite their editorial policies that require them to issue an Expression of Concern and initiate an investigation when they receive documented notifications of integrity issues, Defendants have done neither in this case.

96.    Dr. Manzaneda is entitled to injunctive relief requiring the Defendants to comply with their editorial policies to issue an Expression of Concern and initiate an investigation into the Mortality Article.

97.    Dr. Manzaneda has no adequate remedy at law.

98.    Dr. Manzaneda will suffer irreparable harm absent injunctive relief.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1.    Declaring that Defendants published false and defamatory statements concerning Plaintiff and the RibXcar technique, including statements

---

[7] https://academic.oup.com/pages/for-authors/journals/final-steps-to-publication/changes-to-published-articles.

attributing fatal complications and deaths to RibXcar technique without sufficient evidentiary support or proper causal analysis, in violation of California law and common law defamation principles.

2. Requiring Defendants to comply with their editorial policies to issue an Expression of Concern and initiate an investigation into the Mortality Article and requiring the retraction or correction of any false statements in all publications and media under their control.

3. Awarding Plaintiff general damages for harm to reputation, professional standing, and emotional distress, in an amount to be determined at trial.

4. Awarding Plaintiff special damages for loss of business, professional opportunities, or economic harm, in an amount to be determined at trial.

5. Awarding Plaintiff punitive damages in an amount to be determined at trial for Defendants' willful, malicious, and reckless conduct.

6. Awarding Plaintiff restitution and disgorgement of profits as permitted by Cal. Bus. & Prof. Code §§ 17200 and 17500.

7. Awarding Plaintiff his reasonable attorneys' fees and costs, as permitted by law.

8. Awarding Plaintiff prejudgment interest from the date of accrual of his damages to the date of judgment, and post-judgment interest thereafter.

9. Granting such further relief as the Court may deem just and proper.

### **JURY TRIAL DEMANDED**

Plaintiff demands trial by jury of all issues so triable.

Dated: May 18, 2026

Respectfully submitted,

By: */s/Eduardo A. Maura*
Eduardo A. Maura, Esq.
Florida Bar No. 91303
**Ayala Law, P.A.**

2490 Coral Way, Ste 401
Miami, FL 33145
P: (305) 570-2208
F: (305) 503-7206
eduardo@ayalalawpa.com
*Attorneys for Plaintiff*



**asj_openforum** · Follow

**asj_openforum** Congratulations to the authors of the manuscript: "Waistline Aesthetic Slimming by Puncture and Parallel Approach for Rib Remodeling Procedures," for winning the Best International Article of 2025!

🔗 Click the Link in Bio to read the paper!

14w

**doctorvyas** ✓ Congratulations!

14w   Reply

**dott.elenagiardini** ✓ 👏👏👏

14w   Reply

**mateoleonmd** 🔥🔥🔥

12w   Reply

**asj_openforum** @drjasonplasticsurgery @draustin_prs @kristihustakmd @drcindywuplasticsurgery @chengster79 @drelisabethpotter @stevensigalovemd @dr.maryamzamani @higdonplasticsurgery @noranugent #ASJOpenForum #aestheticsurgery

14w   2 likes   Reply

**drhugoaguilarvilla** ✓ 🔥🔥🔥🔥

23 likes

February 5

Add a comment...

Post

Best Paper of the Year Award 2025

AESTHETIC SURGERY JOURNAL
OPEN ACCESS
ⓄPEN FORUM
OXFORD

Best International Article:

Waistline Aesthetic Slimming by Puncture and Parallel Approach (WASP) for Rib Remodeling Procedures

Alfredo E Hoyos, MD , Mauricio E Perez Pachon, MD , Paulo Duarte, MD , Hugo Aguilar Villa, MD , Ricardo Proto, MD , Mariana Borras-Osorio, MD , Maria P Castiblanco, MD , Mateo Leon-Machicado, MD

Link in Bio!



## SOCIEDAD PERUANA DE CIRUGÍA PLÁSTICA

*«Año de la esperanza y el fortalecimiento de la democracia»*

**Lima, Peru, 08 may 2026**

*Presidente*
Dr. Osvino Maravi Baldeón.

*Vicepresidente*
Dr. José Núñez Castañeda

*Secretario General*
Dr. Johnny Pita Marino

*Secretario de Acción Científica*
Dr. Jorge Marcos Quispe

*Tesorero*
Dr. Raúl Manzaneda Cipriani

*Secretaría de Filiales, Imagen Institucional y RRPP*
Dr. Jorge Hidalgo Penalillo

*Vocal de biblioteca y Publicaciones*
Dr. Fernando Neira Carpio

*Vocal de cultura*
Dra. Rossana Girón Ormeño

*Past President*
Dr. Enrique Ríos Hidalgo

**To:**
Editor-in-Chief / Editorial Board
*Aesthetic Surgery Journal*

**Subject: Formal Request for Editorial Investigation and Retraction of the Publication Entitled "Fatal Complications Associated With Rib Remodeling: A Multinational Patient-safety Case Series"**

Dear Editor-in-Chief and Distinguished Members of the Editorial Board,

On behalf of the Peruvian Society of Plastic Surgery, and in accordance with our institutional duty to uphold patient safety, medical ethics, scientific rigor, and the proper practice of plastic, reconstructive, and aesthetic surgery in Peru, we hereby formally address you regarding the article entitled **"Fatal Complications Associated With Rib Remodeling: A Multinational Patient-safety Case Series,"** published in the *Aesthetic Surgery Journal*.

Our institution wishes to express its profound concern regarding the content, methodology, and ethical implications of the aforementioned publication, in which cases of mortality are reportedly associated with rib remodeling procedures, including cases attributed to Peru. In this regard, we must state that, as a national scientific society, we are formally unaware of the origin, traceability, reporting mechanism, and institutional validation of these alleged mortality cases. Likewise, we have no knowledge that such reports were communicated to, reviewed by, or corroborated through official channels by our institution.

We consider that the reporting of surgical mortality events requires the highest standards of scientific, ethical, and medico-legal rigor. The mere existence of a temporal association between a surgical procedure and a fatal outcome does not, in itself, establish a direct causal relationship. In order to support a valid causal attribution, verifiable documentation is required, including a complete medico-legal autopsy, anatomopathological correlation, comprehensive anesthetic and surgical analysis, reasonable exclusion of alternative causes, evaluation of comorbidities, institutional conditions, professional accreditation of the operating physician, and complete clinical traceability.

In this context, it is particularly concerning that the publication may lead to categorical or technically biased conclusions regarding the causality of the events described, without sufficiently presenting the expert, forensic, and institutional documentation necessary to substantiate such assertions. Furthermore, any statement that may compromise the reputation of a surgical technique, medical



**SOCIEDAD PERUANA DE CIRUGÍA PLÁSTICA**

Presidente
Dr. Osvino Maravi Baldeón.

Vicepresidente
Dr. José Núñez Castañeda

Secretario General
Dr. Johnny Pita Marino

Secretario de Acción
Científica:
Dr. Jorge Marcos Quispe

Tesorero
Dr. Raúl Manzaneda Cipriani

Secretaría de Filiales,
Imagen Institucional
y RRPP
Dr. Jorge Hidalgo Penalillo

Vocal de biblioteca y
Publicaciones
Dr. Fernando Neira Carpio

Vocal de cultura
Dra. Rossana Girón Ormeño

Past President
Dr. Enrique Ríos Hidalgo

professionals, or the practice of plastic surgery in a given country must be supported by objective, verifiable, and methodologically robust evidence.

As an institution, we categorically reject any use of information that is uncorroborated, incomplete, or presented out of context, particularly when such use may favor commercial comparisons, interested technical positioning, or interpretations that exceed the available evidence. Any misrepresentation of the truth, omission of relevant variables, or use of sensitive data for promotional or competitive purposes is contrary to medical ethics, good scientific practice, and the principles of transparency that must govern all biomedical publications.

Likewise, the Peruvian Society of Plastic Surgery reaffirms that invasive aesthetic procedures must be reserved exclusively for professionals who are properly trained, accredited, and certified in plastic surgery. Our institution maintains a firm commitment to combating professional intrusion and protecting patients from surgical procedures performed by physicians who do not possess the corresponding specialized training. Therefore, any analysis of complications or mortality must clearly distinguish whether the procedures were performed by certified plastic surgeons, by non-accredited professionals, or in facilities that failed to meet the required surgical and anesthetic standards.

In view of the foregoing, we formally request that the Editorial Board of the *Aesthetic Surgery Journal* undertake the following actions:

1. The immediate initiation of an editorial investigation into the ethical, methodological, and documentary validity of the aforementioned article.
2. A review of the traceability of the reported cases, particularly those attributed to Peru.
3. Verification of the ethical, institutional, and medico-legal authorizations used for the analysis and publication of said cases.
4. Clarification of the actual participation of scientific societies, institutional committees, or expert reviewers in the validation of the Peruvian cases.
5. Evaluation of potential academic, commercial, or competitive conflicts of interest related to the publication.
6. Formal retraction of the article, should the absence of sufficient documentary support, lack of institutional validation, relevant ethical deficiencies, or conclusions unsupported by verifiable evidence be confirmed.

Additionally, we respectfully request that, while this editorial investigation is underway, the Journal consider issuing an **Editorial Expression of Concern**, in order to prevent the scientific community, patients, and the media from interpreting as conclusive facts any statements that, in our view, require further verification.

The Peruvian Society of Plastic Surgery reiterates its commitment to patient safety, the ethical practice of plastic surgery, responsible scientific research, transparency

Edificio Blu Bluilding, Calle Los Tulipanes 147 Of. 1206 Santiago de Surco      E-mail: sociedadcirugiaplasticaperu@gmail.com

+51 976 469 705                                                                  https://sociedadperuanadecirugiaplastica.com/



**SOCIEDAD PERUANA DE CIRUGÍA PLÁSTICA**

Presidente
Dr. Osvino Maravi Baldeón.

Vicepresidente
Dr. José Núñez Castañeda

Secretario General
Dr. Johnny Pita Marino

Secretario de Acción
Científica:
Dr. Jorge Marcos Quispe

Tesorero
Dr. Raúl Manzaneda Cipriani

Secretaría de Filiales,
Imagen Institucional
y RRPP
Dr. Jorge Hidalgo Penalillo

Vocal de biblioteca y
Publicaciones
Dr. Fernando Neira Carpio

Vocal de cultura
Dra. Rossana Girón Ormeño

Past President
Dr. Enrique Ríos Hidalgo

in the reporting of complications, and the defense of proper medical practice in Peru. Accordingly, we consider it essential that any publication addressing surgical mortality be handled with the utmost prudence, objectivity, and respect for the scientific, ethical, and deontological principles that govern our profession.

We remain at your disposal and look forward to your prompt response, as well as to the corresponding editorial actions.

Sincerely,

**OSVINO MARAVI BALDEON**
**President**
**Peruvian Society of Plastic Surgery**

**JOHNNY PITA MARINO**
**Secretary General**
**Peruvian Society of Plastic Surgery**

Edificio Blu Bluilding, Calle Los Tulipanes 147 Of. 1206 Santiago de Surco    E-mail: sociedadcirugiaplasticaperu@gmail.com

+51 976 469 705    https://sociedadperuanadecirugiaplastica.com/